(Reap. Dec. 10003)

CARL FISCHER MUSICAL INST. CO. *v.* UNITED STATES

Entry No. 8155, etc.

(Decided May 22, 1961)

*Siegel, Mandell & Davidson (Sidney Mandell* of counsel) for the plaintiff.
*William H. Orrick, Jr.,* Assistant Attorney General (*Samuel D. Spector,* trial attorney), for the defendant.

OLIVER, Chief Judge: The appeals for reappraisement enumerated in schedule "A," hereto attached and made a part hereof, were consolidated for trial on motion by counsel for plaintiff, to which defendant offered no objection. When the case was called for trial, counsel for plaintiff limited the appeals to the items identified on the invoices as oboes or clarinets, manufactured by Robert Malerne

& Co. of La Couture-Boussey (Eure), France, and exported between the period from September 1952 through October 1957.

Entry of the merchandise in question was made at the invoice prices, which, plaintiff alleges, are the statutory export values, claimed to be the proper basis for appraisement of these musical instruments. In appraising the merchandise at values higher than the entered values, the appraiser adopted statutory foreign value as the proper basis for appraisement.

Export value and foreign value are defined in section 402 of the Tariff Act of 1930, as amended, as follows:

SEC. 402. VALUE.

\* \* \* \* \* \* \*

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

SEC. 402. VALUE.

\* \* \* \* \* \* \*

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

So far as the present issue is concerned, the foregoing amended definitions of foreign and export values are the same as such values are defined in section 402 of the Tariff Act of 1930, as originally enacted, which applies to some of the entries involved herein.

Plaintiff's claim herein is based on the premise that the clarinets and oboes manufactured by the foreign exporter of the present merchandise for export to the United States are not similar to the clarinets and oboes manufactured for domestic consumption in the markets of France. To support its contention, plaintiff introduced an affidavit, executed by the president of the foreign manufacturing company, and the oral testimony of the president of the plaintiff corporation.

In the affidavit (plaintiff's exhibit 1), the witness states that the business of his company is the manufacture and sale of musical instruments, including clarinets and oboes, "both for export to the United States and for domestic consumption in France," that, during the period in question, clarinets and oboes, manufactured by the foreign exporter, were freely offered for sale and sold in the principal market

of Paris, France, in the wholesale quantities of "one or more instruments," in the ordinary course of trade to all purchasers for export to the United States, and that the prices at which the merchandise was sold to plaintiff herein "were the prices at which such or similar oboes and clarinets were freely offered to all purchasers for export to the United States, packed ready for shipment." The witness testified further that oboes and clarinets manufactured for export to the United States differ in material respects from the instruments that are manufactured for home consumption in the foreign market. In this connection, his affidavit reads as follows:

That the oboes and clarinets sold for export to the United States were and are instruments that have not been rebored; not finally reamed; not tuned or tested for tuning; not phrased; and are not selected for wood, color, and graining as the finished instruments which are sold in the French market for domestic consumption;

That the articles sold for the export market have not been subjected to the undercutting process which is essential on instruments offered for sale and sold in the domestic markets of France; * * *.

In further testimony, the witness stated that the oboes and clarinets that are offered for sale and sold for export to the United States are never offered for sale or sold in the French markets for domestic consumption and that the instruments sold for export to the United States require finishing processes, after their arrival in this country, to make them "suitable for use and commercially saleable."

The president of the plaintiff corporation—an importer and manufacturer of musical instruments—stated that for the past 30 to 35 years he has been familiar with plaintiff's importations and manufacturing operations, and that he, personally, arranged for the purchase of the present merchandise, which was made for the American market. Referring to the clarinets involved herein, the witness testified that they are of "medium type" or "medium classification," which is "the classification that the average school board will purchase for the high school students at, that universities will purchase, or students in the bands, or orchestras will purchase for themselves." (R. 10–11.) The witness testified, further, that clarinets of this type or classification are sold for home consumption in the foreign markets of France as completely finished musical instruments, ready for immediate use, which is not true with respect to these imported clarinets. In their condition, as imported, the clarinets under consideration are not susceptible of use as musical instruments. To become available for such use, these clarinets must be subjected to several processes to attain the proper degree of resonance, intonation, and tone quality. Using one of the imported clarinets (plaintiff's exhibit 2) and tools supplied by the foreign manufacturer (plaintiff's collective illustrative exhibit 3 and illustrative exhibit 4), the witness explained how plaintiff works on these clarinets to bring them

to a merchantable or salable condition. The work done by plaintiff is a "shrinkage process" that consists of undercutting the tone holes and re-reaming the inner bore that controls the intonation and resonant qualities of the instrument. The witness' description of the process appears in the record as follows (R. 23):

> The holes that are drilled in this clarinet, and there are holes, of course, under these keys, the pads as well which you don't see, are tapered from the top and a reverse taper from the bottom. As they are cut that is what we call the undercut, at a taper from the top. Now, these holes must be what we call "phrased" so that they balance each other in the clarinet, the octaves, two octaves. These are the undercutting tools. They are placed beneath the hole and a drill press is put down in here and they are drawn up for the cutting process. These are undercutting reamers and top reamers.

The undercutting and reaming operations performed on these clarinets by plaintiff after their arrival in this country are done by the foreign manufacturer on the same type of instruments when they are sold for home consumption in the French market. The reason for plaintiff doing this work on the imported instruments is, as stated by the witness, because of "different conditions under which the clarinet is manufactured and the conditions in which they are used in America." (R. 26.) Although the witness' testimony was specifically directed to the clarinets in question, in response to a question whether the same testimony would apply to the oboes involved herein, he answered, "Definitely, same thing." (R. 41.)

Defendant's evidence consists of a report (defendant's collective exhibit A), prepared by the American vice consul at Le Havre, France, "concerning the value" of musical instruments, manufactured and shipped by the foreign manufacturer and exporter of the present merchandise. The report includes statements to the effect that some clarinets and oboes are sold in the French market for home consumption, and "Others are manufactured solely for sale to colleges in the United States, or for sale to the United States Army, * * *." The report states further that "All sales are made at the same uniform prices and terms, and the same discounts are allowed," except as to certain instruments sold to plaintiff. The report, however, in no way identifies the exceptions referred to. Mention is also made that special prices for certain instruments are granted to plaintiff, but such references cannot be associated with the merchandise involved in this case. Nowhere in the report is there any information relating to the question of similarity between clarinets and oboes manufactured for export to the United States and the same type or class of instruments produced for home consumption in the foreign market, which is the basic issue presented herein. The said report offers no contradiction to plaintiff's evidence, hereinabove reviewed.

The matter of similarity of imported merchandise with a comparable product sold for home consumption in the foreign market has

been the subject of much litigation both in this court and in the Court of Customs and Patent Appeals. None of the judicial authorities on the subject, however, has laid down a definite rule to be followed in deciding such issue. In other words, whether or not two classes of merchandise are similar or dissimilar for tariff purposes is dependent entirely upon the facts in each individual case.

In the case of *United States* v. *Irving Massin & Bros.* (16 Ct. Cust. Appls. 19, T.D. 42714), our appellate court construed the word "similar," as it is used in section 402 of the Tariff Act of 1922, as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402(b).

While the foregoing interpretation embraces several elements by which similarity for appraisement purposes may be determined, none of the controlling cases on the subject have required that all of the said items of comparison shall be present in deciding the issue. In the case of *United States* v. *Vietor & Achelis* (17 C.C.P.A. (Customs) 412, T.D. 43864), the sole reason for holding goods dissimilar was because their values were different. In *Scharf Bros. Co. (Inc.)* v. *United States* (16 Ct. Cust. Appls. 347, T.D. 43089), a difference in cost of production was not permitted to be a bar to a finding of similarity. In *United States* v. *Thomas* (21 C.C.P.A. (Customs) 254, T.D. 46788), the appellate court emphasized that, in determining whether comparable products are "similar," it is not necessary that the goods be identical since "the requirement of the statute is only that the goods be similar."

The case of *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T.D. 42837, explains the approach to be taken in considering the issue of similarity for valuation purposes as follows:

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402(b).

All of the cited cases were discussed by the appellate court in determining similarity between English home consumption tomato pulp and imported Heinz tomato pulp involved in *H. J. Heinz Company* v. *United States*, 43 C.C.P.A. (Customs) 128, C.A.D. 619.

In the present case, the imported clarinets and oboes in question are not susceptible of the same use, nor capable of performing the same function, as clarinets and oboes of the same type, or classification, that are sold in the French market for home consumption. The clarinets and oboes sold for domestic consumption in the foreign market are completely finished musical instruments ready for use as such. The imported articles under consideration are not. On the contrary, they require certain essential refinements and processing to bring them to the condition for use by a musician. The work done in this country on the clarinets and oboes in question is performed by the foreign manufacturer on instruments that are sold in the French market for home consumption. The instruments in question cannot be substituted, in their imported condition, for the clarinets and oboes sold for home consumption in the foreign market. In a word, the articles in question are not "similar," within the meaning of the term as construed in the cited authorities, to the comparable clarinets and oboes sold for consumption in the French market.

Consideration has been given to all of the cases discussed in the briefs filed by counsel for the respective parties. Reference herein has been made only to such cases considered necessary to support the reasoning followed and the conclusion reached.

On the basis of the present record, and for all of the reasons hereinabove set forth, I find as matter of fact:

(1) That the merchandise in question consists of oboes and clarinets, manufactured by Robert Malerne & Co. of La Couture-Boussey (Eure), France, and exported between the period from September 1952 through October 1957.

(2) That these clarinets and oboes, in their imported condition, require certain essential processing to become available for use as musical instruments.

(3) That the principal market for the present merchandise is Paris, France.

(4) That there was no statutory foreign value therefor at the time of exportation thereof.

(5) That clarinets and oboes, such as or similar to those involved herein, were, at the time of exportation of the present merchandise, freely offered for sale, and sold, in the principal market of the country of exportation, for export to the United States, in the ordinary course of trade, to all purchasers, in wholesale quantities at prices that did not vary according to the quantity purchased.

(6) That the proper basis for appraisement of the clarinets and oboes in question is statutory export value.

(7) That such value for these instruments is the unit entered values.

Accordingly, I hold as matter of law that the proper basis for appraisement of the clarinets and oboes in question, as hereinbefore identified, is statutory export value and that such value therefor is the unit entered values.

As to all other merchandise included on the invoices covered by the entries involved herein, these appeals for reappraisement are dismissed.

Judgment will be rendered accordingly.